J-A27031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| LEANN PAGUE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| EDWARD PAGUE | : | No. 954 MDA 2023 |

Appeal from the Order Entered June 5, 2023
In the Court of Common Pleas of York County Civil Division at No(s):
2020-FC-002648-03

BEFORE:   LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                     **FILED: MARCH 6, 2024**

Appellant, Leann Pague ("Mother"), appeals from the June 5, 2023, order entered in the Court of Common Pleas of York County, awarding her and Edward Pague ("Father") (collectively, "Parents") shared physical and legal custody of their daughters, R.E.P., born in October 2013, and A.R.P., born in March 2016 (collectively, "the Children").[1]  Upon review, we affirm.

We gather the relevant facts and procedural history of this matter from the certified record, which includes numerous stipulations.  Parents married in

_____

[*] Former Justice specially assigned to the Superior Court.

[1] The trial court ordered custody to be shared pursuant to a two-two-three custody schedule.  This arrangement involves a two-week, repeating schedule wherein the Children spend two days with one parent, the next two days with the other parent, then three days with the first parent.  The schedule switches the following week and repeats thereafter.

October 2012.  *See* Joint Stipulation of Facts, 6/2/2023, at 1.  During their marriage, Parents resided together in Etters, Pennsylvania, until they separated in November 2019.  *See id.*

Following separation, Father continued to reside in the marital home. *See* N.T., 5/24/23, at 175.  Father worked as a police officer for the Northern York County Regional Police Department ("the Department") for eighteen years.  *See id.* at 206-07.  Approximately one year following Father's resignation from the Department, in May 2022, he began working full-time for Schaad Detective Agency ("Schaad").  *See id.* at 190.  Thereafter, in November 2022, Father began his current employment as a school security guard for Cedar Cliff High School.[2]  *See id* at 82-83, 241; Joint Stipulation of Facts, 6/2/23, at 2.

In December 2019, after briefly living with her best friend, Kaleigh Seiter, following Parents' separation, Mother obtained a home in Etters, Pennsylvania, where she has resided since.[3]  *See* N.T. at 67.  Mother works in sales/business development for a small company located in Camp Hill, Pennsylvania.  *See id.* at 112; Joint Stipulation of Facts, 6/2/23, at 2.  She

---

[2] Father works for the West Shore School District, *i.e.*, the same district where the Children attend elementary school.  *See* N.T. at 87, 97, 231.

[3] Parents live within a five-minute walk of each other.  *See* N.T. at 197.

works from home, which allows her to put the Children on the bus each morning.[4] *See* N.T. at 185.

Mother initiated the instant custody action when she simultaneously filed for divorce from Father in October 2020. Despite commencing a custody action, the trial court did not enter an initial custody order. Accordingly, Parents maintained an informal two-two-three custody arrangement for approximately three years following Mother's initiation of legal proceedings. *See id.* at 77-78.

On March 2, 2022, Mother filed a notice of proposed relocation, wherein she requested to move with the Children 55 minutes away, to a farm in Delta, Pennsylvania, which is owned by her paramour, John Sommer ("J.S."). *See* Notice of Proposed Relocation, 3/2/2022; N.T. at 41-43. She further requested primary physical custody of the Children. *See* Notice of Proposed Relocation, 3/2/2022. Father responded with a counter-affidavit on March 16, 2022, objecting to Mother's proposed relocation. Following two hearings on Mother's proposed relocation, by order dated July 1, 2022, the trial court denied Mother's request to relocate and provided an opinion examining the

---

[4] When Father was working full-time for Schaad, he had to leave for work before the Children's bus picked them up. *See* N.T. at 185. Parents agreed that, during Father's custody days, he could drop the Children off to Mother, who would then put the Children on the bus. *See id.* Parents continued this practice even after Father ceased working for Schaad full-time. *See id.*

relocation factors set forth at 23 Pa.C.S.A. § 5337(h).[5]   However, the trial court again did not enter a formal custody order.   Accordingly, Parents maintained their two-two-three informal custody schedule.  *See* N.T. at 77-78.

Thereafter, on October 31, 2022, despite the ongoing absence of a formal custody order, Mother filed a petition for modification, wherein she, again, requested primary physical custody of the Children.[6, 7]  Following a conciliation conference, on December 8, 2022, the trial court entered an *interim* custody order, which confirmed Parents' shared legal and physical custody pursuant to the two-two-three custody schedule.   The order also stipulated, *inter alia*, conditions regarding the Children's summer vacations and various holidays.

---

[5] The Honorable Joseph N. Gothie presided over the relocation hearing as well as the subsequent hearing on Mother's petition for modification, which resulted in the subject order on appeal.

[6] Mother acknowledged the lack of an operative custody order in her petition for modification and submitted that she was looking to alter their informal agreement and obtain a formal custody order.  *See* Petition for Modification, 10/31/2022.

[7] At the hearing, Mother reiterated her request for primary physical custody of the Children.  *See* N.T. at 101.  However, she also proffered a five-two-two-five schedule wherein "the same parent has [the Children] Monday and Tuesday of every week, and then the other parent has them Wednesday and Thursday, and then you rotate weekends."  *Id.* at 98.

On May 24, 2023, the trial court conducted a hearing on Mother's petition. She testified on her own behalf and presented the testimony of Diane Wales, department administrator for the Department; Bambi Golden, accounting manager at Schaad; J.S.; Ms. Seiter; and Candy Martin, maternal grandmother. Father testified on his own behalf and additionally adduced the testimony of Catherine Wetzel, paternal grandmother, and Stephanie Pague, paternal aunt. The parties additionally presented, and the trial court admitted, numerous exhibits.

At the time of the hearing, the Children were nine and seven years old, respectively. Parents agreed the Children did not need to testify because they had previously been questioned during the relocation hearing. *See* N.T. at 13. The respective testimony from the above-noted parties largely confirmed the Children are doing well under the existing two-two-three custody schedule. They participate in soccer, and Mother coaches their respective teams. *See id.* at 129. Further, the Children love their teachers. *See id.* at 231. Finally, we again note that Parents currently reside mere minutes from each other and the Children's school. *See id.* at 47, 77-78.

By order dated June 2, 2023, and entered June 5, 2023, the trial court awarded Parents shared legal and physical custody of the Children pursuant to the status quo two-two-three custody schedule. The trial court further

made determinations regarding, *inter alia*, the Children's summer vacation and holiday schedule.[8]

Thereafter, Mother timely filed a notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). In response, the trial court filed a Rule 1925(a) opinion on August 1, 2023.

On appeal, Mother raises the following issues:

1. Whether the trial court abused its discretion and erred in determining that Mother's "main goal" in filing the action was to relocate when Mother did not file a relocation request but rather was forced to file the action to obtain an operative custody order after the trial court failed to enter a custody order upon denying a previously filed relocation?

2. Whether the trial court erred and/or abused its discretion in finding that 23 Pa.C.S.A. § 5328(a)(4) favored Father and in giving it great weight when erroneously considering Mother's relationship with her paramour and relocation as Mother's "main goal"?

3. Whether the trial court erred and/or abused its discretion in ignoring and/or failing to give proper weight to Father's issues with credibility, finding Father to be credible despite numerous statements made under oath that were proven to be untrue?

4. Whether the trial court erred and/or abused its discretion in changing the holiday schedule from the *interim* order,

_____

[8] The trial court made minor changes to the Children's summer vacation and holiday schedule from the *interim* order. Specifically, the subject order removed a requirement that a party's vacation must include their already scheduled custody weekend. Regarding holidays, the subject order did not include Easter, added New Year's Day, and changed Christmas from a shared holiday to an alternating holiday wherein Father has custody during years ending in an even number, while Mother has custody during years ending in an odd number.

removing Easter, adding New Year's Day, and making Christmas an alternating holiday, despite neither party making this request, and removing exchange times?

5. Whether the trial court erred and/or abused its discretion in changing the summer schedule from the *interim* order, removing the requirement that vacations must include the party's already scheduled custody weekend, resulting in the ability for a party to have twelve days of uninterrupted custody?

6. Whether the trial court erred and/or abused its discretion in finding the level of conflict pursuant to 23 Pa.C.S.A. § 5328(a)(13) to be a neutral factor and giving it minimal weight despite Father's testimony that he does not wish to use Our Family Wizard, though the parties have been ordered to do so for months, that he does not check it frequently, and that it does not notify him of messages, which is untrue. Father also testified that he does not wish to engage in conversations with Mother?

Mother's Brief at 4-5 (cleaned up).

We review Mother's issues according to the following scope and standard of review:

Our standard of review over a custody order is for a gross abuse of discretion. Such an abuse of discretion will only be found if the trial court, in reaching its conclusion, overrides or misapplies the law, or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias, or ill-will as shown by the evidence of record.

In reviewing a custody order, we must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the trial court who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of

law, or are unreasonable in light of the sustainable findings of the trial court.

***Rogowski v. Kirven***, 291 A.3d 50, 60-61 (Pa.Super. 2023) (cleaned up).

As with all custody-related matters, this Court's "paramount concern is the best interest of the child involved." ***Id***. at 61 (internal citation and quotation omitted). Indeed, Pennsylvania law provides that the trial court is empowered to change an existing custody order only if the modification will "serve the best interest of the child." 23 Pa.C.S.A. § 5338(a). To that end, the Child Custody Act sets forth sixteen factors at Section 5328(a), which a trial court must consider prior to modifying an existing custody order. ***See E.B. v. D.B.***, 209 A.3d 451, 460 (Pa.Super. 2019). While the trial court's consideration of these factors is mandatory, "it is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." ***Id***. (cleaned up).

These factors provide as follows:

**(a) Factors.**--In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a). In order to evidence its consideration of these required elements, custody courts must set forth a discussion of these best-interest factors "prior to the deadline by which a litigant must file a notice of appeal." *A.V. v. S.T.*, 87 A.3d 818, 820 (Pa.Super. 2014). This Court has emphasized that the trial court, as the finder of fact, determines "which factors are most salient and critical in each particular case." *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa.Super. 2013)(citing *A.D. v. M.A.B.,* 989 A.2d 32, 35-36 (Pa.Super. 2010)).

In conjunction with its custody order dated June 2, 2023, the trial court filed an opinion addressing the Section 5328(a) custody factors. *See generally* Trial Court Opinion ("T.C.O."), 6/2/2023. The trial court weighed Section 5328(a)(1) and (4) in favor of Father. Concomitantly, the trial court determined Section 5328(a)(3), (9), and (10) moderately or slightly favored Mother. The trial court attributed no weight to all other factors as it determined them to be neutral between Parents or not applicable.

Ultimately, the trial court found Section 5328(a)(4) to be determinative because the testimony at the custody trial indicated that, under the current schedule, the Children are doing quite well, have formed close relationships with their teachers, have been seen at the same medical facilities their entire

lives, and saw no reason to "meddle with the status quo." *See* T.C.O., 6/2/2023, at 10-11.

In its opinion accompanying the custody order, the trial court stated the following regarding Section 5328(a)(4):

> The parties stipulated as to the current stability within their lives and [C]hildren's lives. The parties stipulated to, among other things, the parties' employment, the fact that [C]hildren both play soccer and have formed relationships within their teams, that [C]hildren are covered under Father's insurance, and that [C]hildren have received medical care from the same facility since birth.
>
> . . .
>
> The court heard testimony from Mother and her paramour that the current 3-2-2-3 schedule is not stable for [C]hildren as they often do not remember which parent they are supposed to be with each day. They both testified that [C]hildren utilize a planner to tell them which parent has custody on each day. It was their belief that something like a 5-2-2-5 schedule would be more stable for [C]hildren. Father countered this by testifying that [C]hildren used to have a planner, but do not need it anymore. Father stated [C]hildren are well accustomed to the current scheme and know who has custody each day. Father stated that [C]hildren are perfectly fine with the current scheme and that switching to a new scheme would cause instability. He does not believe it is necessary to fix something that is not broken.
>
> The court also heard testimony from Mother and her paramour that they have been in a stable, long-term relationship and have contemplated marriage and moving in with one another. Among the long-term possibilities for their relationship is Mother moving in with her paramour at his farm in Delta, Pennsylvania. Delta is approximately 55 minutes away from the parties' current residences.
>
> The court does not believe that this is . . . simply just one of many possibilities that Mother and her paramour have in mind, but is in actuality their main goal. Approximately eleven months prior to this custody trial the undersigned judge presided over a relocation

hearing regarding this exact matter. At that time, Mother desired to move to her paramour's residence in Delta. The court ultimately denied relocation, reasoning that [C]hildren are perfectly fine where they are and that the relocation would disrupt the current custody scheme. The court believes that Mother filing for modification is another way for her to try to achieve the goal of relocating to Delta. This is not a nefarious goal, it is simply the reality that she is ready to move on to what seems to be a very good relationship for her, and she, as any parent, would like to make sure her [C]hildren accompany her. [C]hildren appear to be doing very well as things are, and the court is reluctant to meddle with the status quo.

There is nothing to dispute that fact that [C]hildren are enjoying stable lives. They are engrained within their soccer teams, and Mother is a coach for both teams. They are doing well in school and have formed close relationships with their teachers. Their teachers even come to their soccer games to watch them play. . . An ultimate relocation to Delta certainly alters this stability that [C]hildren are enjoying. It would certainly disrupt many things with an uncertain range of possible outcomes.

T.C.O., 6/2/2023, at 8-11.

In her first issue, Mother argues that the trial court erred with respect to its July 1, 2022, relocation order. Specifically, Mother contends the trial court erred in not analyzing the Section 5328(a) custody factors in conjunction with the Section 5337(h) relocation factors when it made a determination regarding Mother's relocation request.[9] *See* Mother's Brief at 14-15. Mother further contends that, following the relocation hearing, the trial court failed to

_____

[9] In her brief, Mother has combined her arguments regarding her first and second stated issues. *See* Mother's Brief at 14. Because the issues are distinct, we address them separately.

- 12 -

issue an operative custody order, forcing Mother to file a petition for modification. ***See id.*** at 16.

Separate and apart from the arguable merits of her contentions, Mother's time in which to challenge the trial court's July 1, 2022, relocation order has long passed. The Pennsylvania Rules of Appellate Procedure provide as follows with respect to the timeliness of appellate challenges to trial court findings:

**Rule 903. Time for Appeal**

**(a) General rule.** Except as otherwise prescribed by this rule, the notice of appeal required by Rule 902 (manner of taking appeal) shall be filed within 30 days after the entry of the order from which the appeal is taken.

Pa.R.A.P. 903(a).

If Mother believed the trial court erred in denying her request or for failing to provide an operative custody order, she could have timely filed a notice of appeal. Instead, Mother declined to do so and opted to file the instant petition for modification approximately four months later. Accordingly, Mother's first issue is waived.[10] ***See In re. D.S.***, 979 A.2d 901, 905-06

---

[10] Further, Mother's contention that she was forced to file a petition for modification because the trial court failed to provide an operative custody order is without merit. In its Rule 1925(a) opinion, the trial court explained that its "intent at the time was to leave the informal custody arrangement of the parties unchanged." T.C.O., 8/1/2023, at 3. Once again, if Mother believed the trial court erred in denying her relocation request or for failing to provide an operative custody order following the relocation hearing, she could have timely filed a notice of appeal.

(Pa.Super. 2009) (concluding that a party waives any argument concerning a trial court's finding when it fails to pursue a timely appeal of that holding) (citing Pa.R.A.P. 903(a)).

In her second issue, Mother argues the trial court erred in determining that Section 5328(a)(4), which concerns the need for stability and continuity in the child's education, family life and community life, favored Father. *See* 23 Pa.C.S.A. § 5328(a)(4). Specifically, Mother argues the trial court erroneously focused upon Mother's main motivation in filing a petition, *i.e.*, to relocate to J.S.'s farm. *See* Mother's Brief at 4, 16. Mother posits the trial court's alleged fixation on the reasoning behind Mother's request constituted negative bias. *See id.* at 16. Mother also asserts that Father lacked credibility, and the trial court "ignored all credible evidence and testimony presented in Mother's case." *Id.* at 16-17. Finally, Mother baldly asserts that she was held to a different burden of proof than Father. *See id.* at 18. We discern the crux of Mother's argument is essentially her disagreement with the trial court's determinations regarding credibility and weight of the evidence.

Initially, to the extent that Mother argues the trial court held her to a different evidentiary standard, we find this argument waived. Mother failed to raise this claim in her concise statement or in her statement of questions involved in her brief. *See* Concise Statement, 7/10/2023; *see also* Mother's Brief at 4-5. Indeed, the trial court did not address this proposition in its Rule

- 14 -

1925(a) opinion. Thus, any argument regarding this contention is waived.[11]

***See In re M.Z.T.M.W.***, 163 A.3d 462, 466 (Pa.Super. 2017) (reiterating that issues not included in a concise statement of errors complained of on appeal and statement of questions involved are waived).

In its Rule 1925(a) opinion, the trial court concluded that "[a]side from minor concerns raised by [Mother], [the C]hildren continue to thrive in their current situation and disrupting that was not something this court felt was in their best interest . . . ." T.C.O., 8/1/2923, at 7. The record fully supports the trial court's findings.

Although Mother has attempted to frame the trial court's concern regarding her intent to relocate to Delta, Pennsylvania, as an inappropriate fixation, there is ample testimony that supports the court's concerns in this regard. Primarily, J.S. testified as follows regarding Mother's potential relocation:

> Q: Has [Mother] ever stayed at [your] farm and transported [the Children] to school in the morning?
>
> A: No.
>
> Q: If she were to be awarded a 5-2-2-5, do you anticipate any problems with her transporting [C]hildren to their current school district in the mornings?

---

[11] Even if not waived, we would not disturb the subject order because nothing in the record even remotely indicates that Mother was held to a different evidentiary standard. As discussed *infra*, there is no indication that the trial court was "fixated" on Mother's reason for filing a petition for modification.

A: None, other than the things that a reasonable person could imagine. You know, that would be -- I mean, it could be done . . . .I don't think it would be a problem other than just the, you know, obviously we can all count, . . . 55 minutes is longer than five minutes. But other than that, I don't see it as [a] problem.

N.T. at 47.

Mother confirmed, on direct examination, that the current custody schedule is an impediment to her ability to relocate, as follows:

Q: Now, [Mother] the last time you were here, you testified a lot about the relocation factors, and I want to address that kind of first. We're not here on relocation. Do you understand that?

A: Yes.

Q: Do you have any immediate plans to move to Delta with [J.S.]?

A: No.

Q: Is that something that you and [J.S.] have discussed?

A: We've run the gamut of potentials, yes.

Q: And so is it fair to say at some point that you would like to move in either to Delta or somewhere else with [J.S.]?

A: Yes.

Q: The schedule the way that it is now with a 2-2-3, has that had any impact on your decision about how to combine your two households?

A: Yes.

Q: And why?

A: It is challenging to get onto, like, a schedule with [J.S.] when our schedule isn't the same every week since it's on a biweekly basis.

*Id.* at 75-76.

Mother also emphasized, as follows, that should she relocate to Delta, Pennsylvania, the Children would remain in the West Shore School District:

Q: And is it your preference for [the Children] to continue to remain [in the] West Shore School District for now?

A: Yes.

Q: And would that continue even if you were to combine your household with [J.S.]?

A: Yes.

Q: Would you be able to get [C]hildren to school if you were living in his family home on the farm in Delta?

A: Yes.

*Id.* at 97. The testimony reveals Mother's desired relocation would necessitate a daily, 55-minute commute to and from school for the Children. Accordingly, the trial court's concerns regarding Mother's desire to relocate are well supported by the record.

Regarding the Children's use of planners, the trial court acknowledged the competing testimony proffered by Mother and Father. *See* T.C.O., 6/2/2023, at 9. Indeed, Mother's paramour testified the Children should not require a planner to know which Parent has custody on any given day. *See* N.T. at 57 ("A [seven] and [nine]-year-old should not need a day planner to figure out where they are going."). On direct examination, Father indicated the Children no longer utilize a planner, as follows:

Q: How do you feel about your current custody arrangement?

A: My opinion is if it's not broken, you don't fix it. I think it's great. We -- [the Children] have been doing the same thing now since [Mother] left. They do the exact same thing. They're not looking at a notebook anymore. It's imbedded in their head that we do what we do. On dad's day, we do this, and on mom's day, we do that. . . .

*Id.* at 229. As related *supra*, we defer to the trial court regarding issues of credibility and weight of the evidence. **See Rogowski**, 291 A.3d at 60-61.

Similarly, the trial court heard abundant evidence regarding the Children's stability with the current custody arrangement. Father testified the Children are "well-established in the West Shore School District." **Id.** at 231. He emphasized the Children love their teachers, who went out of their way to attend the Children's soccer games. **See id.** Further, Mother briefly testified that Father's previous employment prevented him from getting the Children off the bus and caused some instability and confusion. **See id.** 80-82. However, shortly thereafter, Mother admitted this was no longer an issue. **See id.** at 87 (Mother acknowledged that Father's new employment in the West Shore School District has resolved the bus problem).

Mother presented other minor trepidations regarding Father's care, namely that, on occasion, Father has not ensured the Children completed their homework, Father did not timely sign forms for the Children, and the Children had not bathed prior to their arrival at Mother's home before school. **See** N.T. at 103-05, 132. Father testified he prepares the Children for the following day in the evenings but admitted that he has forgotten to check their homework and forms folder a couple times. **See id.** at 201-02. Even still,

the trial court was well within its discretion to determine the Children were thriving despite these minor complaints. *See* T.C.O., 8/2/2023, at 7. Overall, as Mother's contentions amount to a disagreement with the trial court's credibility and weight of the evidence determinations, we discern no error or abuse of discretion.

Mother's third claim for relief also involves her disagreement with the trial court's credibility determinations. *See* Mother's Brief at 21-24. Specifically, Mother combines her third and sixth issues to argue the trial court's analysis of Section 5328(a)(13), the level of conflict between the parties and the willingness and ability of the parties to cooperate with one another, is a prime example of the court's "unintentional predisposition against Mother." *Id.* at 21. Mother contends she presented credible evidence regarding Father's failure to communicate with her. *See id.* Father initially failed to utilize Our Family Wizard ("OFW") to communicate despite the trial court's December 2022 *interim* order. *See id.* at 21-22. She further claims there was no evidence she contributes to Parents' conflict or lack of communication other than Father's "bald assertions." *See id.* at 23.

In its opinion following the custody hearing, the trial court made the following determination with regard to Section 5328(a)(13):

> [Parents'] communications with one another, or rather lack thereof, is evidence of conflict between [them]. First, there is the issue that it took Father a month and a half to utilize [OFW]. Since utilizing OFW, communication between [Parents] has been sparse and Father infrequently checks the app. Father testified that he does not wish to use OFW because it does not have a user-friendly

interface and does not notify him of messages. Due to not receiving notifications, he does not always check the app. Father's infrequent use of the app in turn frustrates Mother. The court [knows] that the app does have notifications and that Father perhaps would be less frustrated with it if he familiarized himself with it a little more.

Father also testified that he overall does not wish to engage in conversations with Mother. Father testified that Mother tends to be argumentative both in text and over the phone. Father also testified that Mother is not cordial when they see each other in person. Father gave two anecdotes where Mother essentially gave him the cold shoulder in front of [C]hildren without any particular need or reason. Mother denied Father's allegations and gave anecdotal evidence of a time when Father was upset with her bringing [C]hildren home from a school party because he wanted to pick them up from the bus stop.

There is clearly a moderate level of conflict between [Parents], though it is not to a degree that would require a parenting coordinator to be appointed. On one hand, Father testified that he tries to be cordial [and] that Mother does not treat him the same. This leads Father to avoid contact with Mother. On the other hand, Father's infrequent usage of OFW is an issue in and of itself. The court finds this factor favors neither party. The court gives this factor minimal weight.

T.C.O., 6/2/2023, at 17-18.

Further, the trial court stated the following in its Rule 1925(a) opinion

regarding Father's credibility:

Credibility determinations are within the sound discretion of the court. The court believes [Father] dissembled considerably especially on the issue of using the software for parenting coordination, and the court found that his credibility was poor in that area. He had no legitimate excuse for failing to use [OFW] software and the court incorporated that into discussions of the factors in the custody opinion. The court does not believe that it ignored credibility with respect to [Father], so such a characterization by counsel for [Mother] is not altogether accurate. The court also believes that where it dinged [Father] for dissembling on the OFW issue, for instance, that appropriate

weight was applied. Credibility was considered as evidenced by the discussion in the opinion.

Furthermore, many of the issues litigated, including what was a mini-trial about [Father's] former police career included a number of issues that were not particularly important as it related to the custody matter. . . .Clearly, counsel for [Mother] wanted that to sway the tribunal to a degree that [Father's] testimony would be more significantly and generally discounted, however, in the assessment of the court the relevance of [Father's former career] to the custody matter was considerably attenuated.

T.C.O., 8/1/2023, at 7-8.

The trial court's findings are supported by the record. The trial court ordered Parents to communicate via OFW in the December 2022 *interim* order. *See* N.T. at 88-89; *see also Interim* Order, 12/8/2022. Additionally, Father admitted he did not immediately start using OFW despite the trial court's mandate. *See id.* at 191-92. Further, Father provided various reasons for not using OFW which boil down to his unfamiliarity with the OFW application and his preference for texting. *See id.* at 192-93 ("It doesn't send you notifications. You have to sign in on it every day. . . .To me, [] it's a very difficult thing to follow. . . .She can text me if she needs [something].").

Father testified that he tries to communicate with Mother, but "it's her way or no way. . . .if she doesn't like something" it becomes an argument. *Id.* at 191. He further stated that Mother can be rude to him. *See id.* at 195. On one occasion, Father claimed he offered to help Mother carry soccer equipment and she declined, only to have someone else help her with the equipment shortly thereafter. *See id.*

Father also referred to an incident where Mother slammed her front door after Father dropped the Children off. *See id.* at 120-21, 195. Mother admitted she slammed the door but posited that it was because she was upset that Father had asked the Children to confirm a scheduling question. *See id.* at 120-21. On direct examination, Father retorted he merely asked the Children to confirm that there was a soccer game the following day. *See id.* at 195.

Based on the foregoing, the trial court was well within its discretion to determine that Section 5328(a)(13) did not favor either party. The trial court considered the testimony and made reasonable determinations regarding credibility and weight of the evidence. Once again, with regard to these issues, we must defer to the trial court who viewed and assessed the witnesses first-hand. *See Rogowski*, 291 A.3d at 60-61. Accordingly, we discern no error or abuse of discretion. Mother's third and sixth issues fail.

Regarding her fourth and fifth issues, which she combines, Mother contends the subject order substantially changed the summer vacation and holiday schedule, which was set forth in the December 2022 *interim* custody order, discussed above. *See* Mother's Brief at 25. Mother argues neither Parent requested a change to these schedules, and, therefore, the trial court erred. *See id.*

As aptly stated by the trial court in its Rule 1925(a) opinion, "[f]ollowing a custody trial a court has considerable discretion in drafting terms of shared

physical custody." **See** T.C.O., 8/1/2023, at 9. Indeed, Section 5328(a) states that "[i]n ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child. . . ." **See also Rogowski**, 291 A.3d at 60-61 ("[T]he paramount concern is the best interest of the child involved."). A court does not require a specific request from a party to make alterations to a custody order that it deems in the best interest of a child. Accordingly, the trial court did not abuse its discretion or commit an error of law.

Based on the foregoing, we conclude that none of Mother's contentions entitle her to relief. Accordingly, we affirm the order of the trial court.

Order affirmed.


Judgment Entered.


_____
Benjamin D. Kohler, Esq.
Prothonotary


Date: 3/6/2024